# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 19-3001

BRIAN HUGHES, individually,
and on behalf of all others similarly situated,

*Plaintiff-Appellant*,

*v.*

SOUTHWEST AIRLINES COMPANY,
a foreign corporation,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 18-cv-05315 — **Sara L. Ellis**, *Judge*.

SUBMITTED MAY 13, 2020[*] — DECIDED JUNE 10, 2020

---

[*] We granted the parties' joint motion to decide this case without oral argument because the briefs and record adequately present the facts and legal arguments, and oral argument would not significantly aid the Court. Fed. R. App. P. 34(a)(2)(C).

Before FLAUM, HAMILTON, and ST. EVE, *Circuit Judges*.

FLAUM, *Circuit Judge*. Brian Hughes brought a purported class action suit against Southwest Airlines for breach of contract after it canceled his flight to Chicago because it lacked sufficient de-icing solution at Midway Airport. The district court dismissed the complaint for failure to state a claim and because the contract barred the claimed damages. Hughes appealed. Because Hughes failed to adequately identify any breach, we now affirm.

## I. Background

Plaintiff Brian Hughes bought a Southwest Airlines ticket to fly him from Phoenix to Chicago on February 11, 2018. Shortly before the scheduled boarding time, Southwest cancelled the flight and informed Hughes it might be several days before it could reschedule his flight. Hughes asserts that Southwest cancelled his flight because it ran out of de-icing fluid in Chicago, leading the airline to cancel hundreds of flights out of and into Midway Airport. According to Hughes, no other airline had a similar issue that day. Hughes eventually decided to fly to Omaha, spend the night at a hotel there, and proceed to Chicago the next day, incurring consequential damages for the costs of lodging and the like.

Hughes brought a purported class action against Southwest, alleging breach of contract and negligence.[1] He argued that his ticket obligated Southwest to timely transport him to his destination, and the airline's failure to maintain a sufficient supply of de-icer entitled him to damages. The district

---

[1] As part of his class claims, Hughes states that Southwest also cancelled flights due to insufficient de-icer on several other days in 2017 and 2018.

Case: 1:18-cv-05315 Document #: 45 Filed: 07/02/20 Page 3 of 15 PageID #:314
Case: 19-3001     Document: 00713637664     Filed: 07/02/2020     Pages: 15

No. 19-3001 3

court dismissed the negligence claim with prejudice and Hughes did not appeal. The court dismissed the breach-of-contract claim without prejudice. Hughes amended his complaint, which the court subsequently dismissed with prejudice. Hughes timely appealed the dismissal of his contract claim.

## II. Discussion

"We review de novo a district court's grant of a motion to dismiss for failure to state a claim, accepting all well-pleaded facts in the complaint as true and drawing all reasonable inferences in the plaintiff's favor." *Hutchison v. Fitzgerald Equip. Co., Inc.*, 910 F.3d 1016, 1025 (7th Cir. 2018) (citation omitted). The district court found that Hughes failed to plead that Southwest breached a provision of the contract of carriage ("Contract"). We agree.

### A. Contractual Provisions

The parties' dispute centers on the Contract, which contains a choice of law provision identifying Texas law as controlling. The Contract further contains several relevant provisions that refer to Southwest as "Carrier." We reproduce these provisions below.

Section 4 states:

> No person shall be entitled to transportation except upon presentation of a valid Ticket or proof of identification acceptable to Carrier to confirm that transportation has been purchased. Such Ticket shall entitle the Passenger to transportation subject to this *Contract of Carriage* and, in particular, certain terms and conditions as follows.

4                                                            No. 19-3001

> …
>
> Delays or Involuntary Cancellations. If a Passenger's scheduled transportation is canceled, terminated, or delayed before the Passenger has reached his final destination as a result of a flight cancellation, Carrier-caused missed connection, flight delay, or omission of a scheduled stop, Carrier will either transport the Passenger at no additional charge on another of Carrier's flights, refund the fare for the unused transportation in accordance with the form of payment utilized for the Ticket, or provide a credit for such amount toward the purchase of future travel.
>
> Section 9(a)(1) further explains:
>
>> Canceled Flights or Irregular Operations. In the event Carrier cancels or fails to operate any flight according to Carrier's published schedule, or changes the schedule of any flight, Carrier will, at the request of a Passenger with a confirmed Ticket on such flight, take one of the following actions:
>>
>>> (i) Transport the Passenger at no additional charge on Carrier's next flight(s) on which space is available to the Passenger's intended destination, in accordance with Carrier's established reaccommodation practices; or
>>>
>>> (ii) Refund the unused portion of the Passenger's fare in accordance with Section 4c.

No. 19-3001 5

Section 9(a)(4) contains a liability-limiting clause:

> Limitation of Liability. Except to the extent provided in Section 9a, Carrier shall not be liable for any failure or delay in operating any flight, with or without notice for reasons of aviation safety or when advisable, in its sole discretion, due to Force Majeure Events, including, without limitation, acts of God, meteorological events, such as storms, rain, wind, fire, fog, flooding, earthquakes, haze, or volcanic eruption. It also includes, without limitation, government action, disturbances or potentially volatile international conditions, civil commotions, riots, embargoes, wars, or hostilities, whether actual, threatened, or reported, strikes, work stoppage, slowdown, lockout or any other labor related dispute involving or affecting Carrier's service, mechanical difficulties by entities other than Carrier, Air Traffic Control, the inability to obtain fuel, airport gates, labor, or landing facilities for the flight in question or any fact not reasonably foreseen, anticipated or predicted by Carrier.

**B. Failure to State a Claim**

Hughes argues that under Contract § 4 he was entitled to transportation and that Southwest breached the Contract by failing to keep sufficient de-icer on hand, thus forcing him to incur damages (such as lodging in Omaha) in his attempt to reach Chicago sooner rather than wait days for an alternate flight. The district court concluded that the Contract did not

6                                                                   No. 19-3001

require, explicitly or implicitly, Southwest to maintain sufficient reserves of de-icer, and that imposing such a requirement would constitute an impermissible implied term. We agree.

To establish a breach-of-contract-claim under Texas law, a plaintiff must show: "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages to the plaintiff resulting from that breach.'" *Hunn v. Dan Wilson Homes, Inc.*, 789 F.3d 573, 579 (5th Cir. 2015) (quoting *Foley v. Daniel*, 346 S.W.3d 687, 690 (Tex. App. 2009)).

The primary issue facing Hughes's claim is that Southwest's cancellation of his flight is not itself a breach of the Contract, because the Contract allows Southwest to fulfill its duties to Hughes by placing him on an alternate flight or refunding his fare. Contract § 4 entitled Hughes to transportation *subject to the terms of the Contract*; that same section states that if Southwest cancels a flight, it "will either transport the Passenger at no additional charge on another of Carrier's flights, refund the fare for the unused transportation …, or provide a credit for such amount toward the purchase of future travel." These options are not qualified in any way; they are not, for instance, limited to circumstances where the cancellation was beyond Southwest's control. Likewise, Contract § 9(a)(1) reiterates that in the event of a flight cancellation, Southwest will "[t]ransport the Passenger at no additional charge on Carrier's next flight(s) on which space is available to the Passenger's intended destination" or refund the fare. Again, these options are not qualified or limited in any manner.

No. 19-3001 7

The complaint reflects that Southwest told Hughes it could fly him directly to Chicago in several days, but also offered him an earlier flight connecting in Omaha, which he accepted. Faced with the fact that the cancellation of the flight itself was not a breach, Hughes argues that Southwest breached an *implied* Contract term: maintaining sufficient de-icer to avoid flight cancellations. The district court was correct to reject this argument for two reasons.

First, having determined that Southwest did not breach the Contract by cancelling a scheduled flight, it would be strange to hold that the circumstances underlying the cancellation somehow constituted a breach of an unstated contractual duty. It is the cancellation that is the salient fact for the passenger.

Second, to read in such an implied duty would violate Texas law regarding contracts. Like many states, Texas disfavors reading implied terms into a contract. "Generally, a court looks only to the written agreement to determine the obligations of contracting parties." *Universal Health Servs., Inc. v. Renaissance Women's Grp., P.A.*, 121 S.W.3d 742, 747 (Tex. 2003). "In rare circumstances, however, a court may imply a covenant in order to reflect the parties' real intentions. Obviously, courts must be quite cautious in exercising this power." *Id.* Hughes contends that, in cold climates, sufficient de-icer is a necessary condition for flying, like having a pilot or fuel; therefore, the ability to de-ice planes should be considered an implicit term of the Contract.

"An implied covenant must rest entirely on the presumed intention of the parties as gathered from the terms as actually expressed in the written instrument itself, and it must appear that it was so clearly within the contemplation of the parties

8                                                          No. 19-3001

that they deemed it unnecessary to express it." *Id.* at 748 (citation and internal quotation marks omitted). Reading the Contract as a whole, we do not intuit that the parties contemplated that Southwest would have on hand the resources to fly 100% of its flights as scheduled. Rather, the Contract contemplates that the airline may occasionally be unable to do so and provides courses of action in such cases. This is not the "rare circumstance" where the possession of sufficient de-icer was "so clearly within the contemplation of the parties" it need not be expressed. To hold otherwise would be to implicitly add countless terms to airlines' contracts of carriage; not only to ensure sufficient de-icer, but adequate staff and fuel (to use Hughes's examples), luggage movers and space, and so on. It is not our place to rewrite contracts.

Finally, Hughes points to the limitation of liability clause in § 9(a)(4), which states that, beyond providing transportation on the next available flight or a refund, "Carrier shall not be liable for any failure or delay in operating any flight, with or without notice for reasons of aviation safety or when advisable, in its sole discretion, due to Force Majeure Events …." According to Hughes, we should read this clause to limit the Contract's alternate options of a later flight or refund to circumstances where the cancellation was caused by force majeure, or circumstances outside Southwest's control. Where Southwest caused the disruption, says Hughes, it is liable for breach.

The parties debate whether we should read this clause to refer only to force majeure events or include any events that implicate aviation safety (including circumstances Southwest may have caused itself). We need not reach this argument,

No. 19-3001 9

however, because as explained above, Southwest's cancellation of the flight alone was not a breach; without a breach, there is no question of liability. The alternate options in case of delay or cancellation as laid out in § 4 are unqualified. They apply regardless of the cause of the disruption. It would be unreasonable to read the Contract's limited liability provision to *create* liability precisely where an earlier provision lays out the steps Southwest can take to fulfill its duties in the case of cancellation.

### III. Conclusion

Because Southwest fulfilled its duties under the Contract by offering Hughes a later flight or a refund, the district court appropriately held that Hughes failed to state a claim for breach of contract.[2] Accordingly, we AFFIRM the judgment of the district court.

---

[2] In the alternative, Southwest asks us to hold that the Federal Aviation Act preempts suits like Hughes's, as the claims implicate industry safety concerns. Like the district court, we decline to address this argument because we affirm the district court's basis for its decision.

HAMILTON, *Circuit Judge*, concurring in the judgment. I agree with my colleagues that we should affirm dismissal, but we should affirm on a narrower ground. The point of disagreement hinges on an old and subtle issue in contract law: the difference between liquidated damages and limited remedies, on one hand, and alternative modes of performance on the other.

My colleagues hold that Southwest did not breach its contract but merely chose an alternative mode of performance: later flights that got the passenger to the same destination. They rely on Section 4(c)(4) of the contract, which applies to delays and involuntary cancellations generally. It provides that Southwest will "either transport the Passenger at no additional charge on another of Carrier's flights, refund the fare for the unused transportation in accordance with the form of payment utilized for the Ticket, *or provide a credit for such amount toward the purchase of future travel*." (Emphasis added.) My colleagues conclude that cancellation of plaintiff's flight was not a breach of the contract at all. Even Southwest does not argue such an aggressive interpretation of Section 4(c)(4).

The narrower ground to affirm is that plaintiff has alleged sufficiently that Southwest breached its promise, but that it provided all remedies required under the contract. The difference has little practical effect here, but it could be important in other cases. Treating Southwest's cancellation as a breach with limited remedies fits the parties' expectations better than reading the contract as giving Southwest a free choice among flying on time, flying late, not flying at all and refunding the ticket price, or not flying and giving the passenger only credit toward a future flight.

"Interpretations of contracts as a whole are favored so that none of the language in them is rendered surplusage." *Ewing Construction Co., Inc. v. Amerisure*, 420 S.W.3d 30, 37 (Tex. 2014). Other contract provisions also address cancellations, and specifically weather-related cancellations. They both overlap and conflict with Section 4(c)(4) as interpreted by my colleagues:

— Section 6(a) says that Southwest has sole discretion to refuse to transport a passenger for a variety of reasons, including aviation safety or a "*Force Majeure* Event," defined very broadly to include "meteorological events, such as storms." The passenger's "sole recourse" under Section 6(a) for "refused transportation" is a refund, with no "special, incidental, or consequential damages." Section 6(a) does not mention transportation on later flights as a remedy, nor does it mention credit for future trips.

— Section 9(a) applies to "failure to operate as scheduled." Subsections 9(a)(1) ("Canceled Flights or Irregular Operations") and 9(a)(4) ("Limitation of Liability") both refer to "*Force Majeure* Events," again defined to include all "meteorological events." The subsections work together to say that if a passenger's flight is cancelled or rescheduled, Southwest will, at the passenger's request, either transport the passenger to her intended destination on its next available flight or refund the ticket "in accordance with Section 4c." Section 9(a) does not mention the future-credit option in Section 4(c)(4).

How these different and overlapping provisions are supposed to fit together is a puzzle. In the event of a cancellation, is transportation on a later flight a sufficient remedy or actual performance? What about a credit for future flights?

Case: 1:18-cv-05315 Document #: 45 Filed: 07/02/20 Page 12 of 15 PageID #:323
Case: 19-3001     Document: 00713637664     Filed: 07/02/2020     Pages: 15

12                                                              No. 19-3001

And to the extent there is a choice of remedy, does the choice belong to the passenger or the airline? More abstractly, does the contract provide for alternative ways to perform, all without breaching? Or does it provide for limits on liability in broad and common classes of breaches?

It's telling that Southwest does not rely on Section 4(c)(4), as my colleagues do. Instead, Southwest argues primarily that the contract bars the consequential damages Hughes seeks here. Appellee's Br. at 8–9, 17. Southwest relies on the blend of the broad *force majeure* language and limitation-of-liability language in Section 9(a). Even for a *force majeure* event, this contract does not excuse performance entirely. Rather, a *force majeure* event allows Southwest to provide delayed performance or a refund, and specifically bars consequential damages. Delayed performance is what Southwest provided to Hughes. Under the blend of *force majeure* and limited-liability language, his claim was correctly dismissed.

Looking more generally, this Southwest contract illustrates a common feature in contracts: the parties anticipate that one might fail to perform as promised, and they spell out the consequence of such a failure. When the consequence is a payment by the party failing to perform, the contract can pose a question in a notoriously murky area of contract law: the difference between alternative modes of performance and liquidated damage clauses, seasoned in this case with the limitation-of-liability language. See Stephen L. Sepinuck, *Liquidated Damages, Alternative Performance, and Ensuring the Enforceability of Contingent Charges and Fees*, 5 Transactional Law. 3, 4 (2015) ("the distinction between liquidated damages and alternative performance is about as clear as mud").

The major contract-law treatises recognize the difference but provide little guidance in distinguishing between them in particular cases. See 11 Corbin on Contracts § 58.18 (offering four interpretations of such provisions: liquidated damages, penalty, option for not performing, and adjusted contract price); 24 Williston on Contracts § 65:7 (suggesting that difference between alternative performance and liquidated damages is whether parties intend to continue or terminate relationship); see also Restatement (Second) of Contracts § 361, comment b (distinguishing between liquidated damages and alternative performance).

The difference has no visible practical consequences in this case, but it could have consequences in other cases. With a liquidated damages clause, equitable relief or additional damages might still be available, at least according to Corbin, Williston, and the Restatement (Second). The possibility of additional remedies could be important to Southwest passengers whose flights are cancelled for reasons not covered by the broad aviation-safety and *force majeure* provisions in the contract. Treating such cancellations as breaches, the limitations of liability in Section 9(a)(4) might not apply (though that result could conflict with Section 6(a)—as I said, the contract can be confusing). But if all cancellations are covered by Section 4(c)(4), then, according to my colleagues, there would be no breach and Southwest could merely give passengers a refund or credit for future travel. That approach turns the contract into a mere option contract: Southwest can perform if it feels like it, or it can just offer a refund or future credit, no matter the consequences to a passenger who was counting on making a particular trip. And if all cancellations are covered by Section 4(c)(4), other contract

language becomes redundant, which is of course a result usually to be avoided in contract interpretation.

One way to think about the choice between alternative performance and liquidated damages is to ask how much freedom the promisee intended to give the promisor in choosing among the alternatives. That question almost answers itself here, at least for most passengers. An airline passenger (the promisee) wants to arrive at her destination on time. She recognizes that the world is not perfect, though. If problems arise, she expects the airline to do its best to take her there as soon as it can. She does not intend to give the airline an utterly discretionary choice, regardless of reasons, among (a) flying her to her destination on time, (b) flying her to her destination eventually, (c) refunding her money, or (d) keeping her money and merely offering credit for future travel, perhaps to some other destination. Yet by finding that Southwest did not even breach its contract here, my colleagues attribute to these parties the improbable intent to confer such unfettered discretion on Southwest. I believe it makes more sense—and stays closer to business realities and the parties' intentions—to treat these provisions as a combination of liquidated damages and limitations of damages for a common form of breach.[1]

The option of providing only credit for future travel is particularly troubling. That might be a good choice for some

---

[1] The Southwest contract is a form contract, of course, but airlines have long-term relationships with many of their customers. Customers enter into even contracts of adhesion with expectations about how an airline will accommodate them in flight delays and cancellations, which are always a possibility.

Case: 1:18-cv-05315 Document #: 45 Filed: 07/02/20 Page 15 of 15 PageID #:326
Case: 19-3001    Document: 00713637664    Filed: 07/02/2020    Pages: 15

No. 19-3001                                                                15

passengers, but what about the passenger who takes an airline trip to Southwest destinations only once every two, three, or five years? The credit for future travel might never be used. At best, the passenger is forced to make an interest-free loan to Southwest for months or years. Not even Southwest has argued that we should interpret the contract in such a lopsided way, and we do not need to. Southwest drafted this contract with confusing and overlapping provisions for the rather routine occurrence of a cancelled flight. I would favor the narrower solution that interprets the ambiguities posed by the overlaps in favor of the customers. Assume there was a breach and enforce the limits on damages.

CERTIFIED COPY
A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit